1
2
3
4
5
6                 **UNITED STATES DISTRICT COURT**
7                       **DISTRICT OF NEVADA**
8
9
10
TYRONE L. GARNER,          )
11                           )
           Petitioner,       )     3:03-cv-00315-RCJ-VPC
12                           )
vs.                       )     **ORDER**
13                           )
CRAIG FARWELL, *et al.*,     )
14                           )
          Respondents.     )
15 _____/

16       Before the court for a decision on the merits is an application for a writ of habeas corpus filed

17 by Tyrone L. Garner, a Nevada prisoner.  ECF No. 87.

18       I.  BACKGROUND

19       Early one morning in May of 1998, Garner drove Charles Randolph to a bar in Las Vegas.

20 Randolph entered the bar, shot the bartender to death, and stole cash and video equipment.  In 2000,

21 Garner was convicted in Nevada's Eighth Judicial District court of robbery, conspiracy to commit

22 robbery, burglary while possessing a deadly weapon, and first degree kidnaping and first degree

23 murder, each with the use of a deadly weapon.  He was sentenced to various consecutive terms of

24 imprisonment, including life sentences with the possibility of parole after serving a minimum of

25 seventy years in prison.  The Nevada Supreme Court's decision on Garner's direct appeal recounts,

26

in detail, the facts and circumstances surrounding the crimes for which he was convicted. *Garner v. State*, 6 P.3d 1013, 1016-19 (Nev. 2000).

The Nevada Supreme Court affirmed the judgment of conviction and sentence. *Id*. at 1025. On February 6, 2002, Garner filed a state post-conviction petition, which was denied by the state district court. On March 21, 2003, that denial was affirmed by the Nevada Supreme Court.

On June 10, 2003, Garner filed, in this court, his initial petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254, raising twenty-five grounds for relief. Following litigation of a motion to dismiss, the court determined that several of those claims had yet to be exhausted. Garner was given the option to dismiss the unexhausted grounds and proceed in this court or dismiss the entire petition without prejudice in order to return to state court to pursue exhaustion.

After an aborted attempt to appeal that decision, Garner sought leave to file an amended petition presenting only the exhausted claims and filed a declaration abandoning the unexhausted claims. Thereafter, respondents filed an answer addressing the merits of the claims, in response to which Garner filed a reply.

An order and judgment on the merits was entered on September 27, 2006. Garner filed a notice of appeal and then a motion to amend or correct the order. Before that motion was decided, however, Garner filed a motion for stay and abeyance arguing that a recent change in Nevada law disavowing the doctrine of natural and probable consequences called his convictions into question. The court agreed and vacated the previously entered order and judgment, permitting Garner to return to state court to present his claims to the state courts.

After his second foray into state court ended unsuccessfully, Garner moved to reopen these proceedings and file an amended petition. Respondents filed a motion to dismiss in response to the amended petition. Pursuant to that motion, this court dismissed several claims from the petition. Grounds One, Three, Four, Ten, Eleven, Twelve, and Fourteen through Seventeen remain before the court for a decision on the merits.

2

1   Subsequent to the reopening of this federal case, Garner filed a third state petition for post-

2  conviction relief in June of 2012.  That petition was denied by the state district court.  The Nevada

3  Supreme Court affirmed that denial in May of 2013.

4   II.  STANDARDS OF REVIEW

5   This action is governed by the Antiterrorism and Effective Death Penalty Act (AEDPA).  28

6  U.S.C. § 2254(d) sets forth the standard of review under AEDPA:

7   28 U.S.C. § 2254(d) sets forth the standard of review under AEDPA:

8   An application for a writ of habeas corpus on behalf of a person in custody
    pursuant to the judgment of a State court shall not be granted with respect to any
9   claim that was adjudicated on the merits in State court proceedings unless the
    adjudication of the claim –
10
    (1)  resulted in a decision that was contrary to, or involved an unreasonable
11   application of, clearly established Federal law, as determined by the Supreme Court of
    the United States; or
12
    (2)  resulted in a decision that was based on an unreasonable determination of
13   the facts in light of the evidence presented in the State court proceeding.

14  28 U.S.C. § 2254(d).

15   A decision of a state court is "contrary to" clearly established federal law if the state court

16  arrives at a conclusion opposite that reached by the Supreme Court on a question of law or if the

17  state court decides a case differently than the Supreme Court has on a set of materially

18  indistinguishable facts.  *Williams v. Taylor*, 529 U.S. 362, 405–06 (2000).  An "unreasonable

19  application" occurs when "a state-court decision unreasonably applies the law of [the Supreme

20  Court] to the facts of a prisoner's case."  *Id*. at 409.  "[A] federal habeas court may not "issue the

21  writ simply because that court concludes in its independent judgment that the relevant state-court

22  decision applied clearly established federal law erroneously or incorrectly."  *Id*. at 411.

23   The Supreme Court has explained that "[a] federal court's collateral review of a state-court

24  decision must be consistent with the respect due state courts in our federal system."  *Miller–El v.*

25  *Cockrell*, 537 U.S. 322, 340 (2003).  The "AEDPA thus imposes a 'highly deferential standard for

26

3

1  evaluating state-court rulings,' and 'demands that state-court decisions be given the benefit of the

2  doubt.'"  *Renico v. Lett*, 559 U.S. 766, 773 (2010) (quoting *Lindh v. Murphy*, 521 U.S. 320, 333, n. 7

3  (1997); *Woodford v. Viscotti*, 537 U.S. 19, 24 (2002) (per curiam)).  "A state court's determination

4  that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree'

5  on the correctness of the state court's decision."  *Harrington v. Richter*, 131 S.Ct. 770, 786 (2011)

6  (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).  The Supreme Court has emphasized

7  "that even a strong case for relief does not mean the state court's contrary conclusion was

8  unreasonable."  *Id*. (citing *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003)); *see also Cullen v.

9  Pinholster*, 131 S.Ct.1388, 1398 (2011) (describing the AEDPA standard as "a difficult to meet and

10  highly deferential standard for evaluating state-court rulings, which demands that state-court

11  decisions be given the benefit of the doubt") (internal quotation marks and citations omitted).

12      "[R]eview under § 2254(d)(1) is limited to the record that was before the state court that

13  adjudicated the claim on the merits."  *Pinholster*, 131 S.Ct. at 1398.  In *Pinholster*, the Court

14  reasoned that the "backward-looking language" present in § 2254(d)(1) "requires an examination of

15  the state-court decision at the time it was made," and, therefore, the record under review must be

16  "limited to the record in existence at that same time, i.e., the record before the state court."  *Id*.

17      For any habeas claim that has not been adjudicated on the merits by the state court, the

18  federal court reviews the claim *de novo* without the deference usually accorded state courts under 28

19  U.S.C. § 2254(d)(1).  *Chaker v. Crogan*, 428 F.3d 1215, 1221 (9th Cir. 2005); *Pirtle v. Morgan*, 313

20  F.3d 1160, 1167 (9th Cir. 2002).  *See also James v. Schriro*, 659 F.3d 855, 876 (9th Cir. 2011) (noting

21  that federal court review is *de novo* where a state court does not reach the merits, but instead denies

22  relief based on a procedural bar later held inadequate to foreclose federal habeas review).  In such

23  instances, however, the provisions of 28 U.S.C. § 2254(e) still apply.  *Pinholster*, 131 S.Ct at 1401

24  ("Section 2254(e)(2) continues to have force where § 2254(d)(1) does not bar federal habeas

25

26

4

relief."); *Pirtle*, 313 F.3d at 1167-68 (stating that state court findings of fact are presumed correct under § 2254(e)(1) even if legal review is *de novo*).

Lastly, the Court in *Lockyer* rejected a Ninth Circuit mandate for habeas courts to review habeas claims by conducting a *de novo* review prior to applying the "contrary to or unreasonable application of" limitations of 28 U.S.C. § 2254(d)(1). *Lockyer*, 538 U.S. at 71. In doing so, however, the Court did not preclude such an approach. "AEDPA does not require a federal habeas court to adopt any one methodology in deciding the only question that matters under § 2254(d)(1) – whether a state court decision is contrary to, or involved an unreasonable application of, clearly established Federal law." *Id.*

III.  ANALYSIS OF CLAIMS

**Ground One**

In Ground One, Garner claims that his constitutional rights have been violated because Nevada's statutes do not set forth a definition of conspiracy, which renders Nev. Rev. Stat. § 199.480[1] unconstitutionally vague. Garner alleges both a due process violation and a violation of his

---

[1]  At the time of Garner's conviction Nev. Rev. Stat. § 199.480 provided, in relevant part, as follows:

1. Except as otherwise provided in subsection 2, whenever two or more persons conspire to commit murder, robbery, sexual assault, kidnaping in the first or second degree, arson in the first or second degree, or a violation of NRS 205.463, each person is guilty of a category B felony and shall be punished:

(a) If the conspiracy was to commit robbery, sexual assault, kidnaping in the first or second degree, arson in the first or second degree, or a violation of NRS 205.463, by imprisonment in the state prison for a minimum term of not less than 1 year and a maximum term of not more than 6 years; or

(b) If the conspiracy was to commit murder, by imprisonment in the state prison for a minimum term of not less than 2 years and a maximum term of not more than 10 years, and may be further punished by a fine of not more than $5,000.

. . .

1    right to effective assistance of counsel, the latter due to counsel's failure to challenge the indictment

2    containing the conspiracy charge.

3          In addressing Garner's sufficiency of evidence claim on direct appeal, the Nevada Supreme

4    Court stated as follows:

5          The State charged Garner with conspiring with Randolph to commit robbery
          and aiding and abetting Randolph in the commission of burglary, robbery,
6          kidnapping, and murder.  There appears to be no comprehensive statutory definition
          of conspiracy.  *See* NRS 199.480 (providing various penalties for conspiracy to
7          commit various crimes or acts); NRS 199.490 (providing that it is not necessary to
          prove any overt act was done in pursuance of a conspiracy).

8

9          According to this court's case law, conspiracy is "an agreement between two
          or more persons for an unlawful purpose."  *Thomas v. State*, 114 Nev. 1127, 1143,
10         967 P.2d 1111, 1122 (1998), *cert. denied*, 528 U.S. 830, 120 S.Ct. 85, 145 L.Ed.2d 72
          (1999).  Conspiracy is seldom demonstrated by direct proof and is usually established
11         by inference from the parties' conduct.  *Id*.  Evidence of a coordinated series of acts
          furthering the underlying offense is sufficient to infer the existence of an agreement
12         and support a conspiracy conviction.  *Id*.  However, absent an agreement to cooperate
          in achieving the purpose of a conspiracy, mere knowledge of, acquiescence in, or
13         approval of that purpose does not make one a party to conspiracy.  *Doyle v. State*, 112
          Nev. 879, 894, 921 P.2d 901, 911 (1996).  We conclude that the evidence here was
14         sufficient for the jury to reasonably infer that Garner had agreed to aid Randolph in
          committing the robbery.

15   *Garner*, 6 P.3d at 1019-20.

16   When Garner sought to challenge the constitutionality of Nev. Rev. Stat. § 199.480 in his first post-

17   conviction proceeding, the Nevada Supreme Court held:

18         In his petition Garner claimed that there was insufficient evidence to establish
          a conspiracy and therefore he is "actually innocent," and that NRS 199.480 is
19         unconstitutionally vague because it does not expressly define conspiracy.  This court
          has previously determined that "the evidence was sufficient to prove the conspiracy
20         charge," and that, though "[t]here appears to be no comprehensive statutory definition
          of conspiracy" conspiracy is defined by this court's case law.  Garner cannot avoid the
21         doctrine of the law of the case "by a more detailed and precisely focused argument
          subsequently made after reflection upon the previous proceedings." [Footnote 4 – *See*
22         *Hall v. State*, 91 Nev. 314, 316, 535 P.2d 797, 799 (1975).]

23

24

25

26

                                        6

1   ECF No. 78-8, p. 3-4[2] (footnotes citing direct appeal decision omitted).  Having concluded that the

2   conspiracy charge was sound, the court denied Garner's related ineffective assistance of counsel

3   claim under the *Strickland v. Washington* standard discussed below.  *Id.*, p. 5.

4          Federal law does not prohibit states from relying upon case law to establish the definition of

5   terms used in criminal statutes.  In fact, the Ninth Circuit recently recognized that Nevada case law

6   provided the definition of conspiracy for the purposes of Nev. Rev. Stat. § 199.480.  *See U.S. v.*

7   *Garcia-Santana*, ___ F.3d ___, 2014 WL 667083, *3 (9th Cir. 2014).  In addition, the Nevada

8   Supreme Court applied the correct federal law standard in rejecting the ineffective assistance

9   component of this claim.  Thus, the Nevada Supreme Court's decision is entitled to deference under

10  28 U.S.C. § 2254(d).

11                          **Grounds Three and Four**

12         Grounds Three and Four are premised on jury instructions defining premeditation,

13  deliberation, and malice.  Ground Four alleges that the instructions are unconstitutional because they

14  blurred the distinction between first and second degree murder and relieved the State of its burden of

15  proof on the essential elements of first degree murder.  Ground Three raises a claim under *Polk v.*

16  *Sandoval*, 503 F.3d 903 (9th Cir. 2007), a case in which use of the *Kazalyn* instruction[3] was held

17  unconstitutional.

18         The Nevada statutes define first degree murder, in relevant part, as a "willful, deliberate and

19  premeditated killing."  Nev. Rev. Stat. § 200.030(1)(a).  On February 28, 2000, the Nevada Supreme

20  Court issued its decision in *Byford v. State*, 994 P.2d 700 (Nev. 2000), ruling that the *Kazalyn*

21  instruction was deficient because it defined only premeditation, and failed to provide an independent

22

23  _____

          [2]  References to page numbers in the record are based on CM/ECF pagination.

24

25         [3]  A jury instruction regarding premeditation that was condoned by the Nevada Supreme Court
    in *Kazalyn v. State*, 825 P.2d 578 (Nev. 1992), and issued to the jury in Garner's case (ECF No. 101-2,
26  p. 36).

                                              7

1   definition for deliberation.  *See Byford*, 994 P.2d at 713.  However, in ruling upon Garner's

2   challenge to the *Kazalyn* instruction, the Nevada Supreme Court held that, because *Byford* had no

3   constitutional basis, the new first degree murder instructions it announced would not be applied to

4   cases like Garner's in which appeals were pending on direct review at the time *Byford* was decided.

5   *Garner*, 6 P.3d at 1025.

6          In a recent case, the Ninth Circuit Court of Appeals gave an overview of the state and federal

7   court jurisprudence involving the *Kazalyn* instruction (including the Nevada Supreme Court's

8   holding in Garner's case).  *See Babb v. Lozowsky*, 719 F.3d 1019, 1026-28 (9th Cir. 2013).  For the

9   purposes of Garner's current claim in this court, suffice it to say that the Ninth Circuit's holding in

10  *Polk v. Sandoval*, 503 F.3d 903 (9th Cir. 2007), regarding the unconstitutionality of the *Kazalyn*

11  instruction is no longer good law in light of intervening Nevada Supreme Court decisions (*Babb*, 719

12  F.3d at 1029), but it is nonetheless a violation of due process to not use the new instructions

13  announced in *Byford* in cases in which the conviction was not final at the time of the *Byford* decision

14  (*Babb*, 719 F.3d at 1029).

15          In *Nika v. State*, 198 P.3d 839 (2008), the Nevada Supreme Court determined that its

16  decision in *Garner* was wrong in holding that the federal Constitution did not require application of

17  the new rule in *Byford* to convictions that were not yet final at the time *Byford* was decided.  *Nika*,

18  198 P.3d at 859.  That holding does not factor into the AEDPA analysis, however, because it was

19  premised on state, not federal, law.  *Babb*, 719 F.3d at 1030 n. 6.

20          Even so, the state supreme court's rejection of Garner's *Byford*-based claim runs afoul of

21  clearly established federal law.  In *Babb*, as in this case, the Nevada Supreme Court rejected the

22  defendant's due process challenge to the *Kazalyn* instruction on the ground that the *Byford* decision

23  was issued after the defendant's trial.  *Babb*, 719 F.3d at 1025.  Relying on *Bunkley v. Florida*, 538

24  U.S. 835 (2003), the court in *Babb* concluded that, because the defendant's conviction had yet to

25  become final, "it was an unreasonable application of established federal law and a violation of

26

8

1   Babb's due process rights for the Nevada court not to apply the change in *Byford*, which narrowed

2   the category conduct that can be considered criminal, to her case." *Id*. at 1032.  Given the factual

3   similarity between the two cases, this court is bound by the holding in *Babb* and, therefore, must

4   conclude that the Nevada Supreme Court's rejection of Garner's claim is not subject to the deference

5   required by § 2254(d).

6        Nonetheless, Garner is entitled to relief only if the constitutional error was not harmless.  *See*

7   *Babb*, 719 F.3d at 1033 (applying *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)).  "Generally, . .

8   .when considering whether erroneous instructions constitute harmless error, courts ask whether it is

9   reasonably probable that the jury would still have convicted the petitioner on the proper

10   instructions."  *Id*. at 1034 (citation omitted).

11        In *Babb*, the court of appeals determined that " we need not inquire into the probability that

12   the jury, if given the proper instruction on premeditated murder, would have convicted Babb *on that*

13   *theory*, because although the trial court gave an erroneous instruction on premeditation, we can

14   discern with reasonable probability that the jury instead convicted Babb on a valid felony murder

15   theory."  *Id*. (emphasis in original).  That is the case here, as well.  The Nevada Supreme Court, in

16   affirming the state district court's denial of Garner's third state post-conviction petition, stated:

17   | This court concluded on direct appeal that there was sufficient evidence for
18   | appellant's murder conviction under the felony-murder rule.  *Garner*, 116 Nev. at 782,
     | 6 P.3d at 1021.  Therefore, appellant cannot demonstrate prejudice related to the
19   | premeditation instruction.

20   *Garner v. State*, 2013 WL 3291912, *1 (Nev.).  Not only was there sufficient evidence for a

21   conviction under the felony-murder rule, it is reasonably certain that that is the theory upon which

22   the jury found Garner guilty of first degree murder and that the premeditation instruction did not

23   have a substantial impact on the jury's decision.[4]   The jury found Garner guilty of robbery and

24

25   _____
         [4] As in *Babb*, the jury rendered a general verdict as to first degree murder without specifying the
26   theory that formed the basis of the verdict.  ECF 101-2, p. 45-48.

9

burglary, and the facts in this case leave no doubt that the bartender was killed in perpetration of those offenses.  In addition, during closing argument, the prosecutor focused on the felony murder theory as the means by which Garner was guilty of first degree murder.  ECF No. 101-2, p. 75-76.  Because the erroneous *Kazalyn* instruction constituted harmless error, it does not provide a ground for habeas relief in this case.[5]

**Ground Ten**

In Ground Ten, Garner claims that the jury was improperly instructed on the elements of conspiracy.  The instruction at issue read:

> It is not necessary, in proving a conspiracy, to show a meeting of the alleged conspirators or the making of an express or formal agreement.  The formation and existence of a conspiracy may be inferred from all circumstances tending to show the common intent and may be proved in the same way as any other fact may be proved, either by direct testimony of the fact or by circumstantial evidence or by both direct and circumstantial evidence.

ECF No. 101-2, p. 29.  Garner argues that the instruction is defective because it allows for the finding of a conspiracy without proof of an agreement between the alleged co-conspirators.

On direct appeal, the Nevada Supreme Court concluded that Garner had not shown plain or constitutional error to overcome his waiver of this claim.  *Garner*, 6 P.3d at 1024.  The court went on to observe that the claim was based entirely upon a misinterpretation of the conspiracy instruction, which actually required no "express or formal" agreement among the conspirators.  *Id*.  The court noted that a separate instruction more fully defined a conspiracy as "an agreement between two or more persons to commit any criminal or unlawful act."  *Id*.

Garner has not demonstrated that this claim raises a federal issue, nor has he shown that the state supreme court's rejection of the claim was contrary to, an unreasonable application of, clearly established federal law.  Thus, Ground Ten does not provide a basis for relief in this court.  *See*

---

[5] Garner's remaining allegations in Ground Four regarding the jury instructions are, likewise, without merit – i.e., any defect in the instructions would be harmless error for the same reason.

1  *Carey v. Musladin*, 549 U.S. 70, 76–77 (2006) (holding that, in the absence of any Supreme Court

2  precedent directing a different outcome, the state court decision must be accorded deference under §

3  2254(d)(1)).

4                                **Ground Eleven**

5         In Ground Eleven, Garner claims that insufficient evidence was presented at trial to support a

6  conviction on any of the charged offenses.  He argues that there is no evidence that he conspired with

7  Randolph to commit the crimes or that he knew Randolph's intentions.

8         The standard used by the federal habeas court to test whether sufficient evidence supports a

9  state conviction is the "rational factfinder" standard established in *Jackson v. Virginia*, 443 U.S. 307

10  (1979).  *Mikes v. Borg*, 947 F.2d 353, 356 (9th Cir. 1991).  Under that standard, the court inquires as

11  to "whether, after viewing the evidence in the light most favorable to the prosecution, any rational

12  trier of fact could have found the essential elements of the crime beyond a reasonable doubt."

13  *Jackson*, 443 U.S. at 319 (citation omitted).

14         On direct appeal, the Nevada Supreme Court addressed this claims as follows:

15            Viewed in the light most favorable to the prosecution, the record shows the
        following.  On the night of the crimes, Garner and Randolph were together at a trailer
16      with others smoking crack cocaine.  Neither had money or drugs of their own.  Soon
        after they were refused further cocaine on credit, they left together.  Garner drove
17      Randolph to a location where Randolph obtained a 9–millimeter handgun.  Around
        1:00 a.m., Garner drove Randolph to Doc Holliday's and backed his car into a parking
18      space outside the bar.  Randolph entered the bar, carrying the gun, and Garner knew
        that Randolph had the gun.  Garner waited in the car, which faced the bar and had a
19      view of the bar's two entrances and the entrance to the parking lot.  Randolph later
        came out of the bar carrying a VCR, a multiplexer, and a large amount of cash.  The
20      video equipment was placed on the back seat.  Garner drove away behind the bar
        before turning on the car's headlights.  Upon returning to the trailer, Garner helped put
21      the video equipment in the trunk.  By this time, he and Randolph had acquired several
        hundred dollars' worth of cocaine.  They also had hundreds of dollars in cash, and
22      Garner repeatedly handled a bundle of small-denomination bills.  Driving to the first
        motel, Garner told two women passengers that there was a gun in the car.  At the
23      motel, Garner took the gun from the car and hid it in the motel room.  Garner and
        Randolph displayed and shared more money with the two women.  At the second
24      motel, Garner's demeanor changed dramatically when the TV news reported a murder
        at Doc Holliday's involving a Cadillac like his own.  He immediately dressed, said
25      that he was going to have his car painted, and left.  He drove his car about five blocks
        and parked it.  Garner completely covered the car's exterior with a film of Armor All
26

                                        11

before police found it later that afternoon.  After Garner returned to the motel, he talked to someone on the phone regarding the news report and his car.  When police questioned him in the case, Garner repeatedly lied to them, changing his story several times.

Some of this evidence is ambiguous, i.e., consistent both with Garner's claim that he drove to the bar unaware of Randolph's criminal intentions and with the State's theory that he conspired with Randolph.  However, considered as a whole the evidence is highly incriminating and more consistent with the State's theory.  For example, Garner admitted to police (but not at trial) that he knew Randolph had a gun when Randolph entered the bar, and Garner parked the car in a location and manner that allowed him to act as a lookout and drive away quickly.  Garner had no money or drugs before the crimes and had a large amount of both soon afterwards.  If he had not agreed to assist Randolph in the crimes, there is no apparent reason why Randolph would share the criminal gains so generously with him.  Garner's reactions to the news report are also more consistent with a concern to conceal his involvement with the crimes than with surprise at realizing that Randolph had committed the crimes.  And Garner's claim that he suspected nothing until the news report is unconvincing; his repeated evasions with police also reflect a consciousness of guilt.

One piece of evidence particularly undermines Garner's claim of ignorant innocence—his control over the handgun at the first motel.  His possession of and authority over the gun just a few hours after the crimes at Doc Holliday's are completely inconsistent with his claim that he had nothing to do with the crimes and did not even know that Randolph had a gun at the scene of the killing.

This evidence was sufficient to prove the conspiracy charge, i.e., sufficient for the jury to infer that Garner agreed to drive Randolph to and from Doc Holliday's and act as his lookout so that Randolph could commit a robbery there.  The evidence also was sufficient to prove that Garner aided and abetted Randolph's commission of the robbery and burglary.  Aiding and abetting the commission of an offense is treated and punished the same as directly committing the offense.  *See* NRS 195.020.

There is no direct evidence that Garner intended or agreed that Lokken be kidnapped or murdered.  Nevertheless, under the felony-murder rule, by conspiring to commit robbery Garner is liable for the murder perpetrated in the course of the robbery.  *See McKinney v. Sheriff*, 93 Nev. 70, 72, 560 P.2d 151, 152 (1977); *State v. Beck*, 42 Nev. 209, 213, 174 P. 714, 715 (1918); *cf.* NRS 200.030(1)(b).

We conclude that under the circumstances of this case Garner's status as a conspirator and accomplice establishes his liability for the kidnapping as well.  This court has held that when a person enters into a common plan or scheme but does not intend a particular crime committed by the principal, the person is liable for the crime if "in the ordinary course of things [the crime] was the natural or probable consequence of such common plan or scheme."  *See State v. Cushing*, 61 Nev. 132, 148, 120 P.2d 208, 216 (1941).  This rule does not constitute a per se basis for holding an accomplice to one crime liable for a related crime by the principal simply because the related crime was foreseeable.  *See United States v. Greer*, 467 F.2d 1064, 1068–69 (7th Cir.1972).  To do so would be "to base criminal liability only on a showing of negligence rather than criminal intent."  *Id*. at 1069.  Where the

12

1   relationship between the defendant's acts and the charged crime is too attenuated, the
2   State must provide "some showing of specific intent to aid in, or specific knowledge
    of, the crime charged." *Id.*; *see also* Wayne R. LaFave & Austin W. Scott, Jr.,
3   Criminal Law § 6.8(b), at 590–91 (2d ed.1986). Here, the evidence established that
    Garner entered into a plan or scheme with Randolph to commit robbery and aided
4   Randolph in committing the crime. We conclude that the resulting kidnapping was
    not attenuated from Garner's criminal intent and actions in aid of the robbery; rather,
    it was in the ordinary course of things a natural or probable consequence of the
5   planned robbery. Thus, Garner properly may be held liable for it.

6        The evidence was sufficient to support the judgment of conviction.

7   *Garner*, 6 p.3d at 1020-21.

8        The state supreme court applied the correct federal law standard to Garner's sufficiency of

9   evidence claim. In addition to the liberal *Jackson* standard, this court must factor in the extra layer

10  of deference imposed by AEDPA. *See Boyer v. Belleque*, 659 F.3d 957, 964 -65 (9th Cir. 2011)

11  (noting that "the state court's application of the *Jackson* standard must be 'objectively unreasonable'

12  to warrant habeas relief for a state prisoner"). Viewed in these terms, this court is unable to conclude

13  that a no fairminded jurists could agree with the state court's decision. As such, Garner is not

14  entitled to habeas relief based on Ground Eleven.

15                                **Ground Twelve**

16        In Ground Twelve, Garner claims a violation of his constitutional rights by virtue of the trial

17  court's failure to properly instruct the jury on the effect of voluntary intoxication and the State's

18  burden of proof as to the defendant's specific intent. The challenged instruction read as follows:

19        No act committed by a person while in a state of voluntary intoxication shall
          be deemed less criminal by reason of his condition. In order to negate specific intent,
20        the evidence must show not only the defendant's consumption of intoxicants, but also
          the intoxicating effect of the substances imbibed and the resultant effect on the mental
21        state pertinent to the proceedings.

22  ECF No. 101-2, p. 37. Garner argues that the instruction misstated applicable law and served to

23  shift the burden of proof from the State to the defendant by suggesting that the defendant was

24  obligated to prove lack of specific intent as a result of intoxication.

25

26
                                         13

Addressing the claim on direct appeal, the Nevada Supreme Court agreed that the instruction "improperly implied that the defense had the burden to disprove an element of the State's case." *Garner*, 6 P.3d at 1023.  The court found, however, that the error was harmless because Garner never presented a voluntary intoxication defense and, because he did not present evidence as to the effect of drugs on his mental state, he was not entitled to an instruction on voluntary intoxication.  *Id*. at 1023-24.

In order for this court to grant relief for a constitutional error in a state criminal proceeding, it must be satisfied that the error had a "substantial and injurious effect or influence in determining the jury's verdict."  *Brecht*, 507 U.S. at 637  (quoting *Kotteakos v. U.S.*, 328 U.S. 750, 776 (1946)).  The erroneous instruction would not have had an impact on the jury's deliberations for the reasons offered by the state court.  Garner's defense was that he did not know what his cohort, Randolph, was planning to do in the bar.  His references to drug consumption or intoxication related only to his statements during police interviews following his initial arrest.  The intoxication was offered as an excuse for his shifting story.  Garner has not shown that this claim warrants relief or that the state court's adjudication of the claim was contrary to, or an unreasonable application of, clearly established federal law.

**Ground Fourteen**

In Ground Fourteen, Garner claims that he was deprived of effective assistance of counsel because his counsel failed to investigate and present four witnesses who could have corroborated Garner's version of the events surrounding the crimes.  According to Garner, counsel made no attempt to contact these witnesses (identified as Moose, Chicago, Jackson, and Dave) notwithstanding Garner's instructions to do so.

In *Strickland v. Washington*, 466 U.S. 668 (1984), the Supreme Court propounded a two prong test for analysis of claims of ineffective assistance of counsel: a petitioner claiming ineffective assistance of counsel must demonstrate (1) that the defense attorney's representation "fell below an

14

1    objective standard of reasonableness," and (2) that the attorney's deficient performance prejudiced

2    the defendant such that "there is a reasonable probability that, but for counsel's unprofessional

3    errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 688, 694.

4            In its decision on Garner's first state post-conviction petition, the Nevada Supreme Court

5    addressed this claims as follows:

6                    . . . Garner claimed that counsel was ineffective for failing to interview
     potential witnesses "Moose," "Jay," "Chicago," "Jackson," and "Dave." According
7    to Garner, these potential witnesses "could have and/or would have" refuted the
     testimony of State's witness Joanne McCarty, and undermined her credibility by
8    informing the jury that she "was basically one of the so-called crack-hoes" [sic].
     According to Garner these witnesses could have contradicted McCarty's testimony
9    that after the murder took place Garner changed his clothes, repeatedly removed and
     replaced money from his pocket "like he had never had money before," told McCarty
10   there was "heat" in the car, and removed the gun from the car and placed it behind a
     toilet in a hotel room.  Even assuming that counsel could have located any of these
11   people despite the fact that Garner could not convey the complete identities of said
     individuals and only provided counsel with their approximate locations and/or
12   hangouts, Garner failed to show a reasonable probability the result of the trial would
     have been different had these people been interviewed.  Therefore Garner failed to
13   show that counsel was ineffective in this regard.

14   ECF No. 78-8, p. 7-8.

15           Garner has not shown that this decision was an unreasonable application of the *Strickland*

16   standard or an unreasonable determination of the facts based on the evidence before the state court.

17   Absent from the record is any credible proffer of evidence establishing the content of the testimony

18   that these purported witnesses would have been able to provide at Garner's trial.  Accordingly, even

19   if reviewed *de novo*, this claims is without merit.

20                                    **Ground Fifteen**

21           In Ground Fifteen, Garner alleges that his convictions are unconstitutional because the State

22   "adduced evidence and commented extensively on [his] offer to negotiate the charges against him."

23   ECF No. 87, p. 113.  As factual support for this claim, Garner cites to the State's presentation of a

24   tape recording of his interview with police, wherein he attempted to obtain a benefit for his

25   cooperation, along with the prosecutor's comments in closing arguments about the interview.

26
                                            15

1        Under Nevada law, evidence of a plea of guilty or guilty but mentally ill, which is later

2   withdrawn, or an offer to plead guilty or guilty but mentally ill is not admissible in a criminal

3   proceeding involving the person who made the plea or offer.  Nev. Rev. Stat. § 48.125.  Garner

4   contends that this prohibition extends to any statements made by the accused during plea

5   negotiations.

6        This claim was presented to the Nevada Supreme Court on direct appeal.  The court noted

7   that Garner did not object, at trial, to the use of the tape or to the prosecutor's comments made in

8   closing arguments, thereby waiving the claim.  *Garner*, 6 P.3d at 1022.  The court also concluded

9   that it was not obligated to consider the claim because:  (1) the statements made to police during the

10  interview were not made during plea negotiations and (2) the admission of statements did not

11  constitute plain or constitutional error.  *Id*.  The court reached this conclusion because, unlike the

12  two instances where the court found plain error, Garner made no substantive admissions during the

13  interview during which he tried to obtain a promise of leniency, and because he testified at trial and

14  was able to give the jury his version of events.  *Id*.; *see also*, *Robinson v. State*, 644 P.2d 514 (Nev.

15  1982); *Mann v. State*, 605 P.2d 209 (Nev. 1980).

16       This court agrees with the Nevada Supreme Court.  Ground Fifteen presents a state law claim

17  related to the admission of evidence, which does not implicate the federal law.  *See Estelle v.

18  McGuire*, 502 U.S. 62, 72 (1991) (holding that state court's admission of prior bad acts evidence did

19  not raise a federal question).  No federal relief is available for this claim.

20                              **Ground Sixteen**

21       In Ground Sixteen, Garner claims that he was deprived of effective assistance of counsel as a

22  result of his counsel advising him to testify at trial.  According to Garner, counsel insisted on him

23  taking the stand while failing to advise him of the negative aspects of doing so, such as the use of his

24  prior record and his previous statements to impeach his testimony.

25

26

16

1  In its decision on Garner's first state post-conviction petition, the Nevada Supreme Court

2  addressed this claims as follows:

3  . . . Garner claimed that counsel was ineffective for advising Garner to testify
   at trial when he knew that Garner had made prior statements to the police that could
4  be used by the State to subject him to a "horrific impeachment attack." Garner
   obviously was aware that he had made prior statements to the police. Before Garner
5  took the stand, the district court asked him if he understood that he could not be
   compelled to testify, that if he chose to give up his right not to testify and took the
6  stand he would be subject to cross-examination by the State, and that the State would
   not be allowed to comment on his failure to take the stand if he chose not to testify.
7  Garner answered "yes sir" to each of these inquiries. Garner also confirmed that he
   had discussed his right not to testify with his attorney. Therefore, Garner failed to
8  show that counsel was ineffective.

9  ECF No. 78-8, p. 8.

10  The trial court's canvass prior to Garner's testimony apprised him of his rights in relation to

11  testifying. He cannot show that he was prejudiced by counsel's alleged failure to advise him. This

12  claim lacks merit. Garner has not demonstrated that the state court's rejection of his claim was an

13  unreasonable application of the *Strickland* standard, nor has he demonstrated that the facts found to

14  support the decision were unreasonable in light of the record before the state court.

15  **Ground Seventeen**

16  In Ground Seventeen, Garner claims that he was deprived of effective assistance of counsel

17  because counsel did request a jury instruction regarding an "addict witness." Garner argues that such

18  an instruction was warranted in relation to the State's presentation of the testimony of Joanne

19  McCarty, who, according to Garner, was a known crack addict. He contends that such an instruction

20  would have advised the jury that addicts are unreliable witnesses and tend to lie to gain money or

21  drugs.

22  In its decision on Garner's first state post-conviction petition, the Nevada Supreme Court

23  addressed this claims as follows:

24  . . . Garner claimed that counsel was ineffective for failing to request a
   "cautionary" jury instruction regarding the credibility of State witness McCarty.
25  Garner contended that he was entitled to such an instruction because McCarty was
   "an admitted crack-cocaine-addict, compound-admitted marijuana-user, compound-

26

17

1   admitted alcoholic." McCarty's addiction was not established. McCarty stated on
2   cross-examination that she had not used crack cocaine in almost one year, and that
    when she did she was not addicted. McCarty never stated that she was an alcoholic.
3   She did, however, state that she had used marijuana as recently as two weeks prior to
    her testifying. [Footnote 12 – *See U.S. v. Ochoa-Sanchez*, 676 F.2d 1283, 1289 (9th
4   Cir. 1982) ("An addict instruction is appropriate when a witness is a heroin addict,
    but is unnecessary in several situations, including: (1) when the addiction is disputed,
    (2) when the defense adequately cross-examines the witness about the addiction, and
5   (3) when another cautionary instruction is given.") (citations omitted).] The defense
    thoroughly cross-examined McCarty regarding her drug and alcohol use. [Footnote
6   13 – *See id.*] Jury instruction number seventeen cautioned the jury that "[t]he
    credibility or believability of a witness should be determined by his manner upon the
7   stand, his relationship to the parties, his fears, motives, interests or feelings, his
    opportunity to have observed the matter to which he testified, the reasonableness of
8   his statements and the strength or weakness of his recollections." [Footnote 14 – *See
    id.*] Therefore, Garner failed to show that counsel was ineffective in this regard.
9
10  ECF No. 78-8, p. 9-10.
11         Here again, Garner has not demonstrated that the state court's rejection of his claim was an
12  unreasonable application of the *Strickland* standard, nor has he demonstrated that the facts found to
13  support the decision were unreasonable in light of the record before the state court.
14         IV.   MOTION FOR EVIDENTIARY HEARING
15         Garner has filed a motion styled as a "motion for an evidentiary hearing," with which he
16  appears to be asking this court to revisit or reconsider its decision to dismiss Ground Nine from his
17  amended petition. ECF No. 98. It further appears as if Garner is arguing that, due to this court's
18  alleged error in dismissing Ground Nine, a complete review of the proceedings in this case is
19  warranted. *Id.*; ECF No. 103.
20         The order dismissing Ground Nine was issued fourteen months prior to the instant motion.
21  This court stands by its decisions on procedural and substantive issues in this case. Garner's motion
22  (ECF No. 98) shall be denied.
23         V.   CONCLUSION
24         For the reasons set forth above, Garner's petition for habeas relief is denied.
25
26
                                              18

1                                  *Certificate of Appealability*

2          This is a final order adverse to the petitioner.  As such, Rule 11 of the Rules Governing

3  Section 2254 Cases requires this court to issue or deny a certificate of appealability (COA).

4  Accordingly, the court has *sua sponte* evaluated the claims within the petition for suitability for the

5  issuance of a COA.  *See* 28 U.S.C. § 2253(c); *Turner v. Calderon*, 281 F.3d 851, 864-65 (9th Cir.

6  2002).

7          Pursuant to 28 U.S.C. § 2253(c)(2), a COA may issue only when the petitioner "has made a

8  substantial showing of the denial of a constitutional right."  With respect to claims rejected on the

9  merits, a petitioner "must demonstrate that reasonable jurists would find the district court's

10  assessment of the constitutional claims debatable or wrong."  *Slack v. McDaniel*, 529 U.S. 473, 484

11  (2000) (citing *Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983)).  For procedural rulings, a COA

12  will issue only if reasonable jurists could debate (1) whether the petition states a valid claim of the

13  denial of a constitutional right and (2) whether the court's procedural ruling was correct.  *Id.*

14          Having reviewed its determinations and rulings in adjudicating Garner's petition, the court

15  finds that none of those rulings meets the *Slack* standard.  The court therefore declines to issue a

16  certificate of appealability for its resolution of any procedural issues or any of Garner's habeas

17  claims.

18          **IT IS THEREFORE ORDERED** that petitioner's amended petition for writ of habeas

19  corpus (ECF No. 87) is DENIED.  The Clerk shall enter judgment accordingly.

20          **IT IS FURTHER ORDERED** that petitioner's "motion for evidentiary hearing" (ECF No.

21  98) is DENIED.

22          **IT IS FURTHER ORDERED** that a certificate of appealability is DENIED.

23          Dated this 13th day of March, 2014.

24

25  _____
    UNITED STATES DISTRICT JUDGE

26
                                            19